IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 05–cv–00980–EWN–CBS


GREELEY PUBLISHING COMPANY, a
Nevada corporation doing business as
*Greeley Tribune*,

      Plaintiff,

v.

MARY HERGERT, in her official capacity
as Weld County Public Trustee,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

The federal law claims in this case arise under 42 U.S.C. § 1983.  Plaintiff Greeley

Publishing Company alleges that Defendant Mary Hergert violated the United States and

Colorado Constitutions by retaliating against Plaintiff for its exercise of protected free speech

rights.  Additionally, Plaintiff alleges a violation of the Colorado Consumer Protection Act.  This

matter is before the court on (1) "Defendant Hergert's Motion to Dismiss Plaintiff's First

Amended Complaint," filed September 6, 2005; and (2) "Defendant Mary Hergert's Motion For

Summary Judgment," filed January 30, 2006.  Jurisdiction is based on 28 U.S.C. § 1331 (2006).

-1-

# FACTS

## 1.      *Factual Background*

Plaintiff is the publisher of the *Greeley Tribune*, a daily newspaper in Greeley, Colorado. (Def. Mary Hergert's Mot. For Summ. J., Statement of Undisputed Material Facts ¶ 1 [filed Jan. 30, 2006] [hereinafter "Def.'s Br."]; *admitted at* Pl.'s Resp. to Mary Hergert's Mot. For Summ. J., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 1 [filed Mar. 10, 2006] [hereinafter "Pl.'s Resp."].)  Defendant is the Public Trustee for Weld County, Colorado.  (*Id.*, Statement of Undisputed Material Facts ¶ 2; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 2.)  The Governor of Colorado appointed Defendant to the Office of Public Trustee in January 1999.  (Pl.'s Resp., Pl.'s Statement of Additional Disputed Questions of Fact ¶ 1; *admitted at* Def. Mary Hergert's Reply in Supp. of Mot. For Summ. J., Resp. Concerning Disputed Facts ¶ 1 [filed Apr. 24, 2006] [hereinafter "Def.'s Reply"].)

## a.      *Nature of Defendant's Office*

Public Trustees, such as Defendant, are appointed pursuant to Colorado Revised Statutes § 38–37–102(1), and may be removed from the office by the Governor for good cause shown. (*Id.*, Statement of Undisputed Material Facts ¶ 3; *admitted in relevant part at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 3.)  Weld County does not have any input concerning the appointment or removal of the Public Trustee.  (*Id.*, Statement of Undisputed Material Facts ¶ 5; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 5.)

The official Weld County government website lists the Weld County Office of Public Trustee as a "department" in the Weld County government.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 75; *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 75.)  The Weld County Trustee's Office is subject to audit by the Weld County government.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 73; *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 73.)  Indeed, Colorado Revised Statutes § 38–38–111(2) requires that all excess funds received by the Weld County Public Trustee's Office must be deposited into the Weld County Treasury at the end of each year.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 74, Colo. Rev. Stat. § 38–38–111(2); *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 74.)

Neither Weld County nor Colorado pays Defendant's salary or the salaries of Defendant's employees.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 6; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 6.)  Additionally, neither Colorado nor Weld County have any control over the office.  (*Id.*)  Colorado Revised Statutes § 38–37–102(3) provides that the public trustee "shall conduct the duties . . . at the office of the county treasurer" and that "[t]he board of county commissioners shall furnish, at the expense of the county, all office supplies, including books, forms, and stationery necessary for the use of the public trustee in carrying out the provisions of this section and sections 38–37–101 and 38–37–104, subject to the provisions of section 38–37–104(3)."  Colo. Rev. Stat. §§ 38–37–102(2)–(3).  Despite this, Defendant testified that she works out of a private office for which she pays rent and she does not

use any equipment or supplies provided by Weld County.  (*Id.*, Statement of Undisputed Material Facts ¶ 7.)

### b.      *Foreclosure Advertising*

At the time Defendant assumed her office, the Weld County Public Trustee's Office had published all foreclosures notices handled by that office in the *Greeley Tribune* for more than fifty years.  (Pl.'s Resp., Pl.'s Statement of Additional Disputed Questions of Fact ¶ 2; *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 2.)  Throughout the time Defendant has served as the Public Trustee, through the present, no law firm has ever designated a newspaper other than the one chosen by the Weld County Public Trustee's Office for the firm's foreclosure notices.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 3; *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 3.)  On the day Defendant assumed office, the *Greeley Tribune* charged Defendant's office $5.55 per column inch or $.4625 per line for all foreclosure notice advertisements.  (Pl.'s Resp., Pl.'s Statement of Additional Disputed Questions of Fact ¶ 4; *admitted in relevant part at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 4.)  The *Greeley Tribune* never increased the rate it charged Defendant's office the entire time Defendant was in office.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 6; *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 6.)  Over the years, Defendant's office received numerous complaints regarding the high costs of foreclosures in Weld County due to the high publications costs.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 17; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 17, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 8.)  Despite this, Defendant never sought to change newspapers

until after February 6, 2005.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶¶ 9, 11; *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶¶ 9, 11.)

### c. *Race For District Attorney*

In the Spring of 2004, Defendant and her husband were involved in Tom Quammen's primary campaign for the Republican nomination for Weld County District Attorney.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 14; *admitted in relevant part at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 14.)  During the campaign, Defendant and Bill Hopkins met with Chris Cobler, editor of the *Greeley Tribune*, and encouraged him to investigate Ken Buck's history in the United States Attorney's office.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 15; *admitted in relevant part at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 15.)  Buck was Quammen's opponent in the race for Weld County District Attorney.  (*Id.*)  Ultimately, the *Greeley Tribune* newspaper did not publish any news story that reported the information Defendant alleged concerning Buck.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 16; *admitted in relevant part at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 16.)

In the summer of 2004, the *Greeley Tribune* published an editorial endorsing candidate Buck to become the District Attorney for Weld County.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 17; *admitted in relevant part at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 17.)  Following this publication, Defendant began discussing the possibility of moving the foreclosure notices from the *Greeley Tribune*.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 19; *admitted in relevant part at* Def.'s Reply, Resp. Concerning

Disputed Facts ¶ 19.)  Defendant began contemplating moving the foreclosure notices prior to

learning that the *Greeley Tribune's* publication rates may be the highest rates of any newspaper in

Colorado.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 20; *admitted at* Def.'s

Reply, Resp. Concerning Disputed Facts ¶ 20.)

On January 24, 2005, Defendant had lunch with Sharon Dunn, a representative of the

*Greeley Tribune*, wherein she expressed her anger at the *Greeley Tribune's* endorsement of

candidate Buck.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 23; *admitted at*

Def.'s Reply, Resp. Concerning Disputed Facts ¶ 23.)  Defendant did not express any complaints

regarding the price or quality of the legal notice publication in the *Greeley Tribune* despite the

fact that her office had received numerous complaints regarding the price for all six years she had

been in office.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 24; *admitted at*

Def.'s Reply, Resp. Concerning Disputed Facts ¶ 24.)

> **d.     The Greeley Tribune's February 6, 2005 Editorial Advocating The Abolishment
> of Defendant's Office**

In the week before February 6, 2005, Cobler phoned Defendant to inform her that the

*Greeley Tribune* planned to run an editorial labeling her office as obsolete and unnecessary.  (*Id.*,

Pl.'s Statement of Additional Disputed Questions of Fact ¶ 29; *admitted in relevant part at* Def.'s

Reply, Resp. Concerning Disputed Facts ¶ 29.)  Defendant urged Cobler not to publish such an

opinion and attempted to persuade him that his position was erroneous.  (*Id.*, Pl.'s Statement of

Additional Disputed Questions of Fact ¶ 30; *admitted in relevant part at* Def.'s Reply, Resp.

Concerning Disputed Facts ¶ 30.)

On February 6, 2005, the *Greeley Tribune* published an editorial opining that the Office of the Public Trustee throughout Colorado, including Weld County, should be abolished.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 14; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 14.)  The editorial called Defendant's appointment a "political payback" and quoted her as saying she could come into the office as little as "once or twice a month."  (Pl.'s Resp., Pl.'s Statement of Additional Disputed Questions of Fact ¶ 34, Ex. 23 [2/6/05 *Greeley Tribune* Article]; *admitted in relevant part at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 34.)

On February 24, 2005, the *Greeley Tribune* published a guest commentary by Defendant responding to the editorial advocating the abolishment of her office.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 15; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 15.)  The *Greeley Tribune* also published a response to the editorial written by employees of Defendant's office.  (*Id.*)  Following the publication of the editorial advocating the abolishment of the Office of Public Trustee, Defendant cooperated with the *Greeley Tribune's* efforts to publish an article about the number of foreclosures in Weld County by Spanish surnamed individuals.  (*Id.*, Statement of Undisputed Material Facts ¶ 16; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 16.)

Within three weeks of the February 6, 2005 publication, Defendant called the *Windsor Beacon* newspaper to obtain a rate quote for legal notice advertising.  (Pl.'s Resp., Pl.'s Statement of Additional Disputed Questions of Fact ¶ 37; *admitted in relevant part at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 37.)  At no time prior to February 6, 2005, did

Defendant ever contact anyone at the *Greeley Tribune* to discuss the possibility of obtaining a lower rate for foreclosure notice advertisements in that newspaper.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 9; *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 9.)  At no time prior to February 6, 2005, did Defendant raise any concerns with Plaintiff or the *Greeley Tribune* regarding the size, spacing, or layout of the foreclosure notices.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 11; *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 11.)

At the time Defendant sought the rate from the *Windsor Beacon*, Defendant knew of another newspaper in Windsor, Colorado — The *Windsor Tribune* — but did not seek a rate quote from that paper.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 39; *admitted in relevant part at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 39.)  Defendant testified she did not seek a price quote from the *Windsor Tribune* because it is owned by Plaintiff. (*Id.*, Ex. 4 at 99 [Dep. of Def. Hergert].)

On February 28, 2005, Defendant met with Dunn to discuss the foreclosure news advertising.  (*Id.*, Statement of Additional Disputed Questions of Fact ¶ 50, Ex. 4 at 69 [Dep. of Def. Hergert]; *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 50.)  Defendant told Dunn that she was thinking of using a different newspaper for the foreclosure news advertising. (*Id.*)  At that time, Defendant had not conducted a survey of the different newspapers to determine which paper would offer the most competitive price for the foreclosure advertising. (*Id.*)  Defendant contends that prior to her meeting with Dunn she received an oral price quote from David Persons of the *Windsor Beacon* that was substantially lower than the price presently

offered by the *Greeley Tribune*. (*Id.*, Ex. 4 at 69–72 [Dep. of Def. Hergert].) Specifically,

Defendant contends that Persons quoted Defendant a price of $.2865 per line. (Def.'s Br.,

Statement of Undisputed Material Facts ¶ 27; *admitted in relevant part at* Pl.'s Resp., Resp. to

Def.'s Statement of Undisputed Material Facts ¶ 27.) On March 31, 2005 or April 1, 2005,

Defendant asked her staff to conduct a survey of the various newspapers to determine which

paper could offer the most competitive price. (Pl.'s Resp., Ex. 4 at 69 [Dep. of Def. Hergert].)

Defendant testified that before her staff conducted the survey, she decided to go with the *Windsor*

*Beacon*. (*Id.*, Ex. 4 at 69–70 [Dep. of Def. Hergert].)

> Q.   Okay.  And as I stand — understand your answer here . . . you told Ms.
>      Sharon Dunn [on February 28, 2005] that were thinking of using a different
>      newspaper for the foreclosure news — advertising, is that correct?
> A.   Correct.
>
> * * *
>
> Q.   You told her that on February 28; however, you didn't ask your staff to
>      conduct the survey until March 31 or April 1.  Why not?
> A.   Because we — we actually did the survey to send out to the attorneys to
>      let them know who they could choose, if they so wished, in Weld County.
>      We figured we wanted to go with the *Windsor Beacon*.  We knew the price
>      probably couldn't be beat.  We had already — well, we hadn't by then —
>      by the first of March, second of March, second week in March decided that
>      that's the way we were going to go.
>
> Q.   In fact, it's not true that you knew the price couldn't be beaten?
> A.   No, I didn't, but it — when you're going to practically [fifty] percent less
>      than the [*Greeley*] *Tribune*, you got to figure it's real close.

(*Id.*)

Defendant contends that she decided to switch to the *Windsor Beacon* because Persons

quoted her a substantially lower price than that of the *Greeley Tribune* and the *Windsor Beacon*

was able to utilize scanning technology.  (Def.'s Br., Statement of Undisputed Material Facts ¶

29.)  Despite this contention, Defendant testified that as of the date of her deposition she could

not determine the rate the *Greeley Tribune* charged her.  (Pl.'s Resp., Ex. A–4 at 275 [Dep. of

Def. Hergert].)

> A.  Well, I've tried to figure out what the [Greeley] Tribune was charging, and
>     I am a layman, and I asked someone else if they would, and the closest we
>     could come up to was [fifty-five] cents a line.
>
> Q.  When did you try to make this determination?
> A.  After the — the *Beacon* faxed me back that, the notice, that — what they
>     would charge, but I don't — you know, I don't know.
>
> Q.  Can you look at Exhibit Number — let's just take Exhibit Number 4.
>     Looking at the bill that your office received, is it your testimony that you
>     can't determine what the rate is being charged by the *Greeley Tribune*?
> A.  Correct.

(*Id.*)  Additionally, Persons testified that Defendant communicated a commitment to print the

legal notices in the *Windsor Beacon* prior to any discussion regarding scanning technology.  (*Id.*,

Ex. 7 at 30 [Dep. of David Persons].)

Defendant first learned of scanning technology in 2001 yet did not pursue the use of

scanning technology until 2005.  (Def.'s Br., Ex. A–2 at 49–50 [Dep. of Def. Hergert].)  The

*Greeley Tribune* did not utilize a scanner in the publication of legal notices.  (*Id.*, Statement of

Undisputed Material Facts ¶ 23; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed

Material Facts ¶ 23.)  Cathy Hergert, an employee with Defendant's office, talked several times

with Laura Drake, a former classified supervisor for the *Greeley Tribune*, about the use of

scanning technology.  (*Id.*, Statement of Undisputed Material Facts ¶ 24; *admitted at* Pl.'s Resp.,

Resp. to Def.'s Statement of Undisputed Material Facts ¶ 24.)  Cathy Hergert asked whether the

*Greeley Tribune* would use a scanner for publication of legal notices and noted that utilization of

a scanner would save time and money and would make both the Public Trustee's and the *Greeley*

*Tribune's* jobs easier.  (*Id.*)  Drake raised the issue regarding use of scanner technology for

publication of legal notices during several manager meetings at the *Greeley Tribune* as well as

with the Information Technology manger for the *Greeley Tribune*.  (*Id.*, Statement of Undisputed

Material Facts ¶ 25, Ex. A–11 ¶ 4 [Aff. of Laura Drake]; *admitted at* Pl.'s Resp., Resp. to Def.'s

Statement of Undisputed Material Facts ¶ 25.)  Ultimately, the management team at the *Greeley*

*Tribune* determined that a scanner would not save time since the *Greeley Tribune* would need to

spend a considerable time "editing the scanned legal notice to ensure accuracy prior to

publication."[1]  (*Id.*, Ex. A–11 ¶ 4 [Aff. of Laura Drake].)

On March 30, 2005, Defendant notified the *Greeley Tribune* that she decided to move all

foreclosure notices placed by her office from the *Greeley Tribune* to the *Windsor Beacon*.  (Pl.'s

Resp., Pl.'s Statement of Additional Disputed Questions of Fact ¶ 57; *admitted at* Def.'s Reply,

Resp. Concerning Disputed Facts ¶ 57.)  Jim Elsberry, publisher of the *Greeley Tribune*,

immediately called Defendant and asked her why she chose to move the foreclosure notices.  (*Id.*,

---

[1]Plaintiff contends that the *Greeley Tribune* rejected the use of scanners because it only
considered "the possibility of the *Greeley Tribune* installing and using a scanner inside the
[*Greeley*] *Tribune* office, not the completely different system [Defendant] later adopted (using a
scanner in her own office) with the *Windsor Beacon*."  (Pl.'s Resp., Resp. to Def.'s Statement of
Undisputed Material Facts ¶ 26.)  In support of this proposition, Plaintiff cites Defendant's exhibit
A–11, Drake's affidavit at paragraph twenty-two.  (*Id.*)  Drake's affidavit consists of four
paragraphs and does not mention the aforementioned proposition.  Accordingly, I will not
consider Plaintiff's proffer as to this point.

Pl.'s Statement of Additional Disputed Questions of Fact ¶ 58; *admitted in relevant part at* Def.'s

Reply, Resp. Concerning Disputed Facts ¶ 58.)  Defendant responded to Elsberry by stating:

"well, you are the ones who called us obsolete."  (*Id.*, Pl.'s Statement of Additional Disputed

Questions of Fact ¶ 58, Ex. 9 at 176 [Dep. of Jim Elsberry]; *admitted at* Def.'s Reply, Resp.

Concerning Disputed Facts ¶ 58.)

Thereafter, Plaintiff contends that Defendant's office conducted a survey of legal

newspapers in Weld County in an effort to manufacture a paper trail that would misleadingly

suggest the survey had been done prior to Defendant's decision to move the legal notices to the

*Windsor Beacon*.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 64.)

Defendant contends that she conduced the survey to prepare the April 2005 notice announcing the

move to the *Windsor Beacon*.  (Def.'s Reply, Resp. Concerning Disputed Facts ¶ 64.)

**2.      *Procedural History***

On May 31, 2005, Plaintiff filed its initial complaint in this court.  (Compl. and Jury

Demand [filed May 31, 2005].)  Plaintiff asserted claims against Defendant in her individual and

official capacities for: (1) retaliation for exercising its First Amendment free speech rights in

violation of 42 U.S.C. § 1983; (2) retaliation for exercising its first amendment rights in violation

of Article II, section 10 of the Colorado Constitution; and (3) violation of the Colorado

Consumer Protection Act.  (*Id.* ¶¶ 27–52.)  On July 11, 2005, Defendant filed a motion to dismiss

Plaintiff's complaint.  (Def. Hergert's Mot. to Dismiss Pl.'s Compl. [filed July 11, 2005].)

Defendant argued that: (1) she was entitled to qualified immunity for all claims in her official

capacity; (2) Plaintiff did not suffer any damages under the Colorado Constitution; and (3)

Plaintiff's punitive damage claim should be dismissed.  (*Id.*)  On July 29, 2005, Plaintiff filed a response to Defendant's motion.  (Pl.'s Br. in Opp'n to Def. Hergert's Mot. to Dismiss Pl.'s Compl. [filed July 29, 2005].)  On August 15, 2005, Defendant filed a reply in support of her motion.  (Def. Hergert's Reply in Supp. of Mot. to Dismiss Pl.'s Compl. [filed Aug. 15, 2005].)

On August 23, 2005, Plaintiff filed an amended complaint.  (First Am. Compl. and Jury Demand [filed Aug. 23, 2005] [hereinafter "First Am. Compl."].)  Plaintiff dropped all of its claims against Defendant in her individual capacity.  (*Id.*, passim.)  On September 6, 2005, Defendant filed a motion to dismiss Plaintiff's first amended complaint.  (Def. Hergert's Mot. to Dismiss Pl.'s First Am. Compl. [filed Sept. 6, 2005] [hereinafter "Def.'s Mot. to Dismiss"].) Defendant argues that: (1) Plaintiff has failed to allege sufficient facts to support a violation of its constitutional rights; (2) Plaintiff's claims for damages against Defendant are barred by the Eleventh Amendment; (3) Plaintiff's claim for injunctive relief violates state law; and (4) Plaintiff cannot demonstrate damages under the Colorado Constitution.  (*Id.*, *passim*.)  On September 26, 2005, Plaintiff filed a response to Defendant's motion to dismiss.  (Pl.'s Br. in Opp'n to Def. Hergert's Mot. to Dismiss Pl.'s First Am. Compl. [filed Sept. 26, 2005] [hereinafter "Pl.'s Resp. to Def.'s Mot. to Dismiss"].)

On September 6, 2005, Defendant filed a motion to stay the proceedings pending a determination of Eleventh Amendment immunity.  (Def. Hergert's Mot. For Stay of Proceedings Pending Determination of Eleventh Amendment Immunity [filed Sept. 6, 2005].)  On September 26, 2005, Plaintiff filed a response to Defendant's motion for stay of proceedings.  (Pl.'s Resp. to Def.'s Mot. For Stay of Proceedings Pending Eleventh Amendment Immunity Determination

[filed Sept. 26, 2005].)  On October 14, 2005, Defendant filed a reply in support of her motion for

stay of proceedings.  (Def. Hergert's Reply in Supp. of Mot. For Stay of Proceedings Pending

Determination of Eleventh Amendment Immunity [filed Oct. 14, 2005].)  On October 20, 2005,

Magistrate Judge Craig B. Shaffer denied Defendant's motion to stay proceedings.  (Courtroom

Mins. [filed Oct. 20, 2005].)

On January 30, 2006, Defendant filed a motion for summary judgment.  (Def.'s Br.)

Defendant argues that: (1) Plaintiff cannot establish a violation of section 1983 because the

undisputed facts show that Defendant's decision to utilize the *Windsor Beacon* for publication of

legal advertising was not motivated by Plaintiff's publication of adverse news and editorial

coverage; (2) Defendant is not a "person" within section 1983 and is entitled to Eleventh

Amendment immunity; (3) there is no implied right of action to enforce the Colorado Constitution

when an adequate remedy is available under section 1983; (4) Plaintiff's state law claim under

Colorado's Consumer Protection Act is barred by the Colorado Governmental Immunity Act; and

(5) Plaintiff's claim for prospective injunctive relief must be denied because there is an adequate

remedy at law.  (Def.'s Br. at 12.)  On March 10, 2006, Plaintiff filed a response in opposition to

Defendant's motion for summary judgment.  (Pl.'s Resp.)  On April 24, 2006, Defendant filed a

reply in support of her motion for summary judgment.  (Def.'s Reply.)  This matter is fully

briefed.

# ANALYSIS

## 1.    *Standard of Review*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2003); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."  *Celotex Corp.*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "'Only disputes over facts that might affect the outcome of the suit under governing law will preclude the entry of summary judgment.'"  *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998) (quoting *Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when ruling on a summary judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).  The factual record must be viewed in the light most favorable to the nonmoving party.  *Concrete Works, Inc.*,

36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 [10th Cir. 1990].)

**2.      *Evaluation of Claims***

As stated above, Plaintiff asserts three claims in its first amended complaint: (1) violation of section 1983, (2) violation of the Colorado Constitution, and (3) violation of the Colorado Consumer Protection Act.  (First Am. Compl. ¶¶ 32–56.)  I evaluate each claim for relief in turn.

**a.      *Plaintiff's Claim Under 42 U.S.C. § 1983***

Plaintiff alleges that Defendant violated section 1983 by retaliating against it for exercising its First Amendment rights to freedom of speech and press.  (First Am. Compl. ¶¶ 32–42.) Specifically, Plaintiff alleges that Defendant's decision to utilize the *Windsor Beacon* for the foreclosure advertisements was motivated by Plaintiff's publication of adverse news and editorial coverage.  (*Id.*)

Section 1983 provides:

> Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C.A. § 1983 (2004).  To establish a claim under section 1983, a plaintiff must establish (1) a deprivation of a federal or constitutional right by (2) a person acting under color of state law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).  Section 1983 allows a plaintiff to seek

money damages from government officials who have violated his or her constitutional rights. *Id.* I evaluate each prong below.

### (1)   *First Amendment Violation*

Defendant asserts two arguments in favor of its motion for summary judgment on Plaintiff's section 1983 claim. (Def.'s Br. at 12–31.) First, Defendant contends that this court does not need to evaluate the retaliatory nature of Defendant's conduct because Plaintiff lacks any present or former contractual right, or other legal entitlement, to publish the foreclosure advertisements and Defendant's revocation of the placement of such legal advertising even if retaliatory does not violate Plaintiff's constitutional rights. (*Id.* at 12–19.) Second, Defendant argues that even if the court evaluates Defendant's alleged retaliatory conduct, her actions in moving the foreclosure advertisements were not substantially motivated by Plaintiff's publication of adverse news and editorial coverage. (*Id.* at 19–29.)

From the outset I note that Plaintiff's lack of contractual relationship with Defendant is not fatal to its constitutional claim. Defendant asserts that Plaintiff's claim for violation of constitutional rights must fail because "Plaintiff claims no present or former contractual right to publication of legal advertising, and no other legal entitlement to publish the legal advertising is alleged to exist." (Def.'s Br. at 13.) Indeed, Defendant argues that because Plaintiff lacks a contractual right or other legal entitlement, "Defendant's revocation of the placement of such legal advertising with Plaintiff for retaliatory reasons, even if true, does not violate Plaintiff's constitutional rights." (*Id.*) Defendant's argument is misplaced.

The United States Supreme Court has held that "'the government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'" *United States v. Am. Library Ass'n. Inc.*, 539 U.S. 194, 210 (2003) (quoting *Bd. of Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668, 674 [1996]). Indeed, Defendant's reliance on *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000), dispels Defendant's contention that a lack of present or former contractual rights precludes a claim for violation of constitutional rights.  In *Worrell*, the Tenth Circuit concluded in the context of First Amendment retaliation claims that "an alternative to the *Pickering* balancing is warranted when allegations of retaliatory conduct are directed at a defendant who is not the plaintiff's employer and when there is no contractual relationship between them." *Worrell*, 219 F.3d at 1212.  Thus, I must evaluate Plaintiff's retaliation claim.

Plaintiff alleges that Defendant retaliated against it by moving all foreclosure advertising from the *Greeley Tribune* to the *Windsor Beacon* after Plaintiff's February 6, 2005 article and Plaintiff's endorsement of Buck for District Attorney.  (Pl.'s Resp. at 29–30.)  In order to establish a retaliation claim based on First Amendment protected speech, Plaintiff must establish the following elements: (1) Plaintiff was "engaged in constitutionally protected activity;" (2) Defendant's actions caused Plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity;" and (3) "[D]efendant's adverse action was substantially motived as a response to [] Plaintiff's exercise of constitutionally protected conduct."  *Id.* (quoting *Lackey v. County of Bernalillo*, No. 97–2265, 1999 WL 2461, at *3 [10th Cir. Jan. 5, 1999]).  The parties do not dispute elements one and two.  (Def.'s Br. at 19–29.)

-18-

Thus, I must evaluate whether Defendant's decision to move the foreclosure advertisements was motivated by Plaintiff's February 6, 2005 article or Plaintiff's endorsement of Buck for District Attorney.  Defendant contends that her "actions in publishing the non-designated legal advertising in the *Windsor Beacon* was not substantially motivated by Plaintiff's publication of adverse news and editorial coverage and rather was made exclusively for cost and efficiency reasons." (Def.'s Br. at 19.)  I find that there are genuine issues of material fact regarding whether Defendant's actions were substantially motivated by a retaliatory motive.  Below, I discuss some of the evidence from which a reasonable jury could conclude that a retaliatory motive was a substantial factor in Defendant's decision.

At the time Defendant assumed her position, the Weld County Public Trustee's Office had published all the legal notices of foreclosures handled by that office in the *Greeley Tribune* for more than fifty years.  (Pl.'s Resp., Pl.'s Statement of Additional Disputed Questions of Fact ¶ 2; *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 2.)  On the day Defendant assumed office, the *Greeley Tribune* charged Defendant's office $5.55 per column inch or $.4625 per line for all foreclosure notice advertisements.  (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 4; *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 4.)  During Defendant's tenure her office received numerous complaints regarding the high costs of foreclosures in Weld County due to foreclosure publication costs.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 17; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 17.) Despite this, Defendant never contacted anyone at the *Greeley Tribune* to discuss the possibility of obtaining a lower rate for foreclosure notice advertisements.  (Pl.'s Resp., Pl.'s Statement of

Additional Disputed Questions of Fact ¶ 9; *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 9.) Additionally, Defendant never sought to move the advertising. (*Id.*) Indeed, Defendant testified that as of the date of her deposition, she could not determine the rate Plaintiff charged her. (Pl.'s Resp., Ex. A–4 at 275 [Dep. of Def. Hergert].)

On February 28, 2005, three weeks after the *Greeley Tribune* published the article advocating the abolishment of the Office of the Public Trustee throughout Colorado, Defendant met with Dunn to discuss the foreclosure news advertising. (*Id.*, Pl.'s Statement of Additional Disputed Questions of Fact ¶ 50, Ex. 4 at 69 [Dep. of Def. Hergert]; *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 50.) Defendant told Dunn that she was thinking of using a different newspaper for the foreclosure advertising. (*Id.*) At no time prior to that meeting had Defendant conducted a survey of the different newspapers to determine which paper would offer the most competitive price for the foreclosure advertising. (*Id.*)

Defendant contends that prior to that meeting she received an oral price quote from Persons at the *Windsor Beacon* offering Defendant a substantially lower than that of the *Greeley Tribune*. (Pl.'s Resp., Ex. 4 at 69–72 [Dep. of Def. Hergert].) Again, as of Defendant's deposition, she was not aware of the rate the *Greeley Tribune* charged her. (*Id.*, Ex. A–4 at 275 [Dep. of Def. Hergert].) Additionally, Defendant testified that she knew of two newspapers in Windsor, Colorado, and only called one — the *Windsor Beacon* — because she knew that Plaintiff owned the *Windsor Tribune*. (*Id.*, Ex. 4 at 99 [Dep. of Def. Hergert].) Indeed, it was not until March 30, 2005, after Defendant already decided to move the foreclosure advertising to the *Windsor Beacon*, that Defendant asked her staff to conduct a survey of the prices offered by

-20-

the various local newspapers.  (*Id.*, Ex. 4 at 69–70 [Dep. of Def. Hergert].)  Moreover, when

Elsberry contacted Defendant to ask her why she moved the foreclosure notices to the *Windsor*

*Beacon*, Defendant replied: "well, you are the ones who called us obsolete."  (*Id.*, Pl.'s Statement

of Additional Disputed Questions of Fact ¶ 58, Ex. 9 at 176 [Dep. of Jim Elsberry]; *admitted at*

Def.'s Reply, Resp. Concerning Disputed Facts ¶ 58.)  Viewing the foregoing evidence in a light

most favorable to Plaintiff, a jury could reasonably conclude that cost and efficiency may not have

been Defendant's motivation in moving the foreclosure advertising from the *Greeley Tribune* to

the *Windsor Beacon*.

Defendant asserts that "[t]here is no direct evidence that Defendant made the decision to

move the placement of legal advertisements from the *Greeley Tribune* to the *Windsor Beacon* due

to her anger over the *Greeley Tribune's* editorial position."  (Def.'s Br. at 26.)  Defendant's

argument is misplaced.  Allegations of retaliation are often supported by circumstantial evidence

alone.  *Smith v. Maschner*, 899 F.2d 940, 949 (10th Cir. 1990).  Indeed, in a case such as this,

subjective elements percolate through all the evidence and circumstantial evidence of timing and

witness testimony may be the only means of testing and supporting allegations of retaliation.  *See*

*id.*; *Durant v. Indep. Sch. Dist. No. 16 of LeFlore County, State of Okl.*, 990 F.2d 560, 564 (10th

Cir. 1993).  Thus, a jury could infer that Defendant's actions were in retaliation for the *Greeley*

*Tribune's* publishing of the February 6, 2005 article advocating the abolishment of Defendant's

office.  Accordingly, Plaintiff has demonstrated sufficient evidence to establish a First Amendment

violation.  Next, I must evaluate whether Defendant is a "person" within the meaning of section

1983.

### (2)   *"Person" Within Section 1983*

Defendant argues that "even if the facts advocated by Plaintiff stated a claim for violation of its First Amendment rights, Plaintiff's claim would be barred by the Eleventh Amendment to the United States Constitution" because "[t]he State and agencies of the State are not 'persons' within the meaning of 42 U.S.C. § 1983." (Def.'s Br. at 32.)  The United States Supreme Court determined that States and "arms of the states" are not "persons" within the meaning of section 1983.  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989).

> Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties.  The Eleventh Amendment bars such suits unless the State has waived its immunity.

*Id.*  "Neither a state, nor a governmental entity that is an arm of the state for Eleventh Amendment purposes, nor a state official who acts in his or her official capacity, is a 'person' within the meaning of [section] 1983."  *Harris v. Champion*, 51 F.3d 901, 905–06 (10th Cir. 1995).  If Defendant is an "arm of the state," she is entitled to Eleventh Amendment immunity and she will not be considered a "person" for purposes of section 1983.  Defendant contends that "the Office of Public Trustee is an arm of the state for Eleventh Amendment purposes" and "Defendant is entitled to summary judgment as a matter of law on Plaintiff's First Claim for Relief for damages." (Def.'s Br. at 34.)

The question of whether a particular agency has Eleventh Amendment immunity is a question of federal law.  *V–1 Oil Co. v. Utah State Dept. of Pub. Safety*, 131 F.3d 1415, 1421 n.1 (10th Cir. 1997).  This federal question can be answered only after considering the provisions of

state law that define the agency's character. *Id.* The "arm of the state" doctrine bestows immunity on entities created by state governments that operate as alter egos or instrumentalities of the states. *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 574 (10th Cir. 1996). In determining whether Defendant qualifies as an "arm of the state," courts in this jurisdiction must evaluate two considerations: (1) the degree of autonomy given to the agency, and (2) the extent of financing the agency receives from the state. *Id.* at 574–75. Specifically, the Tenth Circuit held that:

> [t]he court first examines the degree of autonomy given to the agency, as determined by the characterization of the agency by state law and the extent of guidance and control exercised by the state. Second, the court examines the extent of financing the agency receives independent of the state treasury and its ability to provide for its own financing.

*Id.* I evaluate each factor below.

### (A)    Autonomy Given to The Office of Public Trustee

In evaluating the first factor — autonomy given to the agency — I must evaluate the characterization of the agency by state law and the control exercised by the state.

### (i)    Characterization of The Office of Public Trustee Under Colorado State Law

The undisputed facts demonstrate that the Office of the Public Trustee is characterized as a county office and part of the Weld County government. A county is not the alter ego of the state for Eleventh Amendment purposes and is thus a person under the federal civil rights statute — 42 U.S.C. § 1983. *Lake County Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979); *Wigger v. McKee*, 809 P.2d 999, 1003 (Colo. App. 1990). The following factors

suggest that the Office of the Public Trustee is a county, as opposed to state, office: (1) the Weld County Trustee's Office is subject to audit by the Weld County government, (Pl.'s Resp., Pl.'s Statement of Additional Disputed Questions of Fact ¶ 73; *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 73); (2) Colorado Revised Statutes § 38–38–111(2) requires that all excess funds received by the Weld County Public Trustee's Office be deposited into the Weld County Treasury at the end of each year, Colo. Rev. Stat. § 38–38–111(2); (3) the official Weld County government website lists the Weld County Office of Public Trustee as a "department" in the Weld County government, (Pl.'s Resp., Pl.'s Statement of Additional Disputed Questions of Fact ¶ 75; *admitted at* Def.'s Reply, Resp. Concerning Disputed Facts ¶ 75); and (4) Colorado Revised Statutes § 38–37–102(3) provides that the public trustee "shall conduct the duties . . . at the office of the county treasurer" and that "[t]he board of county commissioners shall furnish, at the expense of the county, all office supplies, including books, forms, and stationery necessary fo the use of the public trustee in carrying out the provisions of this section   . . ." Colo. Rev. Stat. § 38–37–102(3).

Additionally, the Colorado Supreme Court has characterized the Office of Public Trustee as a county office.  *See People v. Sabin*, 227 P. 565, 566 (Colo. 1924) ("The office of public trustee is a county office."); *Walsh v. People*, 211 P. 646, 647 (Colo. 1922) ("The public trustee is a county officer.  His appointment was provided for by the General Assembly after the adoption of the Constitution . . ." [citing *Chambers v. People*, 202 P. 1081, 1082 [Colo. 1921] ).  While these cases do not directly concern whether a public trustee's office falls outside Eleventh Amendment protection, they support the fact that Colorado does not characterize Defendant's

office as a state office.  Accordingly, this factor weighs in favor of finding that Defendant's office is not an "arm of the state."

### (ii)        Control Exercised By The State of Colorado

Defendant testified that neither the Governor, nor any representative from the Governor's office, has ever directed her in any manner in connection with her duties as public trustee.  (Pl.'s Resp. at 37–38; Def.'s Reply at 45–46.)  Despite this, Defendant contends that the Office of Public Trustee is an "arm of the state" because state statute controls the functions of the Office of Public Trustee and the Governor has the ability to appoint and remove the Public Trustee.  (Def.'s Br. at 35, 40.)  The Public Trustee's authority to act is set forth exclusively in state statute and the statute leaves very little discretion to the Public Trustee in performance of those duties.  Colo. Rev. Stat. §§ 38–37–104.  This factor weighs in favor of finding that the Office of Public Trustee is an "arm of the state."

Additionally, the Governor of Colorado appoints the Weld County Public Trustee and such trustee can only be removed by the Governor for "good cause shown."  Colo. Rev. Stat. § 38–37–102(1).  The fact that the Governor of Colorado reserves appointment and removal power lends support to the fact that Colorado exercises sufficient control over the Office of Public Trustee.  *See Kashani v. Purdue Univ.*, 813 F.2d 843, 846–47 (7th Cir. 1987) (university did not have sufficient autonomy from state to be considered more like a county where majority of members of university's governing bodies were appointed by governor to serve set terms.); *see also Darby v. Hinds County Dept. of Human Servs.*, 83 F. Supp. 2d 754, 757 (S.D. Miss. 1999) (the State Department of Human Services was an "arm of the state" for purposes of Eleventh

Amendment immunity because the department was part of the executive branch, it received

funding from the state, and the officers served at the will and pleasure of the governor).  While the

Governor's appointment and removal powers do lend support to Defendant's position, it appears

the majority of courts that consider this factor do so in conjunction with the fact that the agency

at issue receives funding from the state.  *See Darby*, 83 F. Supp. 2d at 757 ; *see also Darlack v.*

*Bobear*, 814 F.2d 1055, 1059–60 (5th Cir. 1987) (department was an "arm of the state" because

it received funding from the state and the Secretary of the Department was under the control and

supervision of the governor.); *Miccosukee Tribe of Indians of Florida v. United States*, 980 F.

Supp. 448, 459–60 (S.D. Fla. 1997) (water management district was an "arm of the state" in part

because it had to submit annual budget and expense reports to the governor for approval and

disapproval).  As discussed in more detail below, it is undisputed that the Office of Public Trustee

does not receive any funds from Colorado.  (Def.'s Br. at 45.)  Thus, despite the Governor's

appointment and removal powers this factor tips in favor of finding that Colorado does not

exercise sufficient control over the Office of Public Trustee.

### (B)    *The Office of Public Trustee Does Not Receive Any Financing From The State of Colorado*

The second factor in determining whether the Office of Public Trustee is an "arm of the

state" is the amount of funding it receives from Colorado, as opposed to funding it receives

independent of the state treasury and its ability to generate its own funding.  *See Watson*, 75 F.3d

at 574–75.  As stated above, the Office of Public Trustee does not receive any funds from

Colorado.  (Def.'s Br. at 45.)  Neither Colorado nor Weld County pay the salaries for the Weld

County Public Trustee or the employees in her office.  (*Id.*, Statement of Undisputed Material

Facts ¶ 6; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 6.)

The Public Trustee's salary is paid "from the fees collected by the [P]ublic [T]rustee" as provided

in Colorado Revised Statutes § 38–37–104(2)(c).  Thus, the Public Trustee generates her own

income.  *See* Colo. Rev. Stat. § 38–37–104.  Indeed, it appears that the only source of funding for

the Office of Public Trustee comes from the board of county commissioners.  Specifically, "[t]he

board of county commissioners shall furnish, at the expense of the county, all office supplies,

including books, forms, and stationery necessary for the use of the public trustee in carrying out

the provisions of this section and sections 38–37–101 and 38–37–104, subject to the provisions of

section 38–37–104(3)."  Colo. Rev. Stat. § 38–37–102(3).  Thus, with respect to funding the

Office of Public Trustee is entirely autonomous from the State and generates its own funding to

the extent it does not receive it from the county.  *See Sonnenfeld v. City and County of Denver*,

100 F.3d 744, 749 (10th Cir. 1996) (municipality was not "arm of the state" because it had not

shown the degree of state funding it received); *Christy v. Pennsylvania Tpk. Comm'n*, 54 F.3d

1140, 1144 (3rd Cir. 1995) (despite the fact that state had authority over appointment of agency

members, agency was not "arm of the state" entitled to Eleventh Amendment immunity because

four of five sources of agency's funding were not state-derived).  Accordingly, this factor weighs

heavily in favor of finding that the Office of Public Trustee is not an "arm of the state."

### (C)     Conclusion

Based on the foregoing, I conclude that the Office of Public Trustee is not an "arm of the state."  As described above, the Tenth Circuit mandates that courts consider the autonomy of the agency and the extent of financing the agency receives from the state.  *Watson*, 75 F.3d at 574.  Colorado law characterizes the Office of Public Trustee as a county office as opposed to a state office.  Additionally, the Governor's minimal control of the Office of Public Trustee is outweighed significantly by the fact that the Office of Public Trustee does not receive any funding from Colorado and generates almost all of its funding on its own.  The minimal funding the office does receive comes from the county in which the office sits.  Indeed, Defendant admits that she does not receive any funding from Colorado.  (Def.'s Br. at 45.)  It is difficult to imagine how Defendant is entitled to Eleventh Amendment immunity when she admittedly cannot satisfy half of the *Watson* test.  Rather, Defendant is a "person" within the meaning of section 1983 and Defendant is not entitled summary judgment on Plaintiff's first claim for relief — violation of section 1983.

### b.     Violation of The Colorado Constitution

Plaintiff's second claim for relief is styled "Violation of the Colorado Constitution." (First Am. Compl. ¶¶ 43–49.)  Defendant contends that Plaintiff cannot state an independent claim under the Colorado Constitution because an adequate remedy exists pursuant to section 1983 and the United States Constitution.  (Def.'s Br. at 54.)   The Colorado Supreme Court in *Board of County Commissioners v. Sundheim*, 926 P.2d 545 (Colo. 1996), held that "[w]hile it may be appropriate to recognize an implied stated constitutional cause of action when there is no other

adequate remedy . . . where other adequate remedies exist, no implied remedy is necessary." *Sundheim*, 926 P.2d at 553. In interpreting *Sundheim*, the Tenth Circuit held that "[s]ection 1983 provides such an adequate remedy." *Arndt v. Koby*, 309 F.3d 1247, 1255 (10th Cir. 2002). The outcome of the plaintiff's section 1983 claim does not make it "any less 'available' as a legal remedy under *Sundheim*." *Id.* As discussed above, Plaintiff has an adequate remedy under section 1983, thus, Plaintiff does not have an implied state constitutional cause of action.

Plaintiff argues that "[t]he ruling in *Sundheim*, however, supports rather than contradicts" Plaintiff's position. (Pl.'s Resp. at 44.) Specifically, Plaintiff suggests that "the Colorado Supreme Court acknowledged that Colorado law permits an implied cause of action for damages to enforce a right protected by the Colorado Constitution 'when there is no other adequate remedy.'" (*Id.* at 44–45 [quoting *Sundheim*, 926 P.2d at 553.].) I am not persuaded by Plaintiff's semantical and nonsensical distinction. *Sundheim* is clear that there is no implied cause of action when there is an adequate remedy under section 1983. *See Sundheim*, 926 P.2d at 553.

   **c.      Colorado Consumer Protection Act**

Plaintiff's third claim for relief in this case is styled as violation of the "Colorado Consumer Protection Act." (First Am. Compl. ¶¶ 50–56.) Specifically, Plaintiff contends that Defendant made false representations concerning the prices offered and the advertising practices of the *Greeley Tribune* and the *Windsor Tribune*. (*Id.* ¶ 51.) Defendant contends she is entitled to summary judgment on Plaintiff's third claim for relief because: (1) Plaintiff did not give adequate notice pursuant to the Colorado Governmental Immunity Act ("CGIA"); and (2)

Defendant did not knowingly misrepresent the rate charged by the *Greeley Tribune*.  (Def.'s Br.

at 60–63.)  I need only evaluate Defendant's first argument below.

The CGIA requires claimants to notify public entities and employees prior to suit

concerning their claims.  Colo. Rev. Stat. § 24–10–109.  Colorado Revised Statutes § 24–10–109

provides in relevant part:

> [a]ny person claiming to have suffered an injury by a public entity or by an
> employee thereof . . . whether or not by a willful and wanton act or omission, shall
> file a written notice as provided in this section within one hundred eighty days after
> the date of discovery of the injury, regardless of whether the person then knew all
> of the elements of a claim or of a cause of action for such injury.  Compliance with
> the provisions of this section shall be a jurisdictional prerequisite to any action
> brought under the provisions of this article, and failure of compliance shall forever
> bar any such action.

Colo. Rev. Stat. § 24–10–109(1).  The statute mandates that the notice "shall contain the

following:

> (a)   The name and address of the claimant and the name and address of his
>        attorney if any;
> (b)   A concise statement of the factual basis of the claim, including the date,
>        time, place, and circumstances of the act, omission, or event complained of;
> (c)   The name and address of any public employee involved, if known;
> (d)   A concise statement of the nature and the extent of the injury claimed to
>        have been suffered;
> (e)   A statement of the amount of monetary damages that is being requested.

*Id.* § 24–10–109(2).  Finally, the CGIA provides that:

> [n]o action brought pursuant to this article shall be commenced until after the
> claimant who has filed timely notice pursuant to subsection (1) of this section has
> received notice from the public entity that the public entity has denied the claim or
> until after ninety days has passed following the filing of the notice of claim required
> by this section, whichever occurs first.

*Id.* § 24–10–109(6).  Plaintiff asserts that it "substantially complied" with the CGIA notice

requirements.  I assume, without deciding, that Plaintiff complied with the notice requirements in

Colorado Revised Statutes § 24–10–109(2).  Despite this, Plaintiff's claim fails because it did not

comply with the requirements in section six.

Plaintiff asserts that sometime after April 1, 2005, Defendant published a notice wherein

she: (1) listed the incorrect advertising rate for the *Greeley Tribune*; (2) failed to list any rate for

the *Windsor Tribune*; (3) falsely characterized the nature of her survey of local newspapers; and

(4) falsely asserted that the *Windsor Beacon* was the only newspaper in the county that could

handle scanned foreclosure notices.  (Pl.'s Resp. at 47.)  These actions form the basis of Plaintiff's

Colorado Consumer Protection Act claim.  Plaintiff contends that beginning on March 30, 2005

and concluding on May 10, 2005 Plaintiff's counsel sent a series of letters to the Weld County

Attorneys' Office describing the factual nature of the claims against Defendant and her office.

(*Id.*)  Plaintiff asserts that it was not until after it filed its initial complaint on May 26, 2005, that

"[Plaintiff] learned that [Defendant] failed to ameliorate the false and deceptive information

contained in the original 'notice' after promising in a May 5, 2005 letter that she would reflect the

correct advertising rate for the Greeley Tribune . . ."  (Pl.'s Resp. at 47–48.)  By its own

admission, Plaintiff neither received a letter from Defendant denying the claim, nor did Plaintiff

wait ninety days before filing the lawsuit.  (*Id.*)  Accordingly, Plaintiff's Colorado Consumer

Protection Act Claim is barred by the CGIA.

### d.   *Plaintiff's Claims For Prospective Injunctive Relief*

Plaintiff's first amended complaint requests injunctive relief as follows:

> [t]hat Defendant and her successors, assigns, employees, agents, and representatives be permanently enjoined from further retaliation or deceptive trade practices against Plaintiff, and in particular, that they be enjoined from refusing to place non-designated legal advertisements with either the *Greeley Tribune* or the *Windsor Tribune* where the rates for legal advertisements with those publications are lower than any other legal newspaper within Weld County; . . . [t]hat Defendant . . . be enjoined to publish corrective advertising that ameliorates the misrepresentations and/or false inferences created by Defendant through her false [n]otices concerning legal advertising rates and advertising practices of the *Greeley Tribune* and *Windsor Tribune*.

(First Am. Compl., Prayer For Relief ¶¶ B–C.)  Defendant contends that she is entitled to summary judgment on Plaintiff's claims for injunctive relief because Plaintiff's request: (1) violates state law, (2) is unmanageable, and (3) Plaintiff has an adequate remedy at law.  (Def.'s Br. at 50.)  I need only address Defendant's third argument.

The basis of injunctive relief in federal courts has always been irreparable harm and inadequacy of legal remedies.  *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57 (1975).  Said another way, "if damages at law cannot adequately compensate the injury sustained . . . or cannot be reasonably measured, then the remedy at law is inadequate and injunctive relief providing for specific performance may be appropriate because of irreparable injury."  *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1354 (10th Cir. 1989).  As discussed above, Plaintiff has an adequate remedy at law.  This reality is sobered by the fact that Plaintiff makes a demand for "actual, statutory, or nominal damages" relating to its claims.  (First Am. Compl., Prayer For Relief ¶ D.)  Moreover, Plaintiff does not demonstrate how: (1) it is irreparably harmed, or (2) its actual damages will not compensate it for the alleged injuries sustained.

Poignantly, Defendant raised this issue in her motions to dismiss Plaintiff's first amended complaint and for summary judgment. (Def.'s Mot. to Dismiss at 19 n.7; Def.'s Br. at 53.)  In both instances Plaintiff failed to respond to Defendant's contention that Plaintiff has an adequate remedy at law. (Pl.'s Resp. to Mot. to Dismiss at 3–21; Pl.'s Resp. at 42–44.)  Plaintiff's silence is troubling and bolsters the court's opinion that Plaintiff has an adequate remedy at law. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim for injunctive relief.

*3.*      *Conclusions*

Based on the foregoing it is therefore ORDERED that:

1.     Defendant's motion to dismiss Plaintiff's first amended complaint (# 36) is DENIED as moot.

2.     Defendant's motion for summary judgment (# 92) is GRANTED in part and DENIED in part.  Defendant's motion is GRANTED with respect to Plaintiff's second and third claims for relief and Plaintiff's claim for injunctive relief.  Defendant's motion is DENIED with respect to Plaintiff's first claim for relief — violation of section 1983.

3.     The court will hold a Final Pretrial Conference commencing at 10:00 o'clock a.m. on Thursday, **June 29, 2006**, in Courtroom A1001 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado.  In preparing for and participating in the conference, the parties and counsel will (1) follow the Instructions for Preparation and Submission of Final Pretrial Order, a copy of which can be downloaded from the court's web site, specifically http://www.cod.uscourts.gov/forms/ewn_fin_pre_ord_ins.pdf and (2) utilize the specific template

located at http://www.cod.uscourts.gov/forms/ewn_fin_pre_ord.wpd  These specific web

addresses should be used to insure that the proper format is observed.

Dated this 6th day of June, 2006.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge

-34-